UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,

v.

JOVAN VAVIC,                                                CRIMINAL ACTION NO. 19-10081-IT

Defendant.


REPORT AND RECOMMENDATION
ON THE DEFENDANT'S MOTION FOR NEW TRIAL
BASED ON NEWLY DISCOVERED EVIDENCE (#1565)

KELLEY, U.S.M.J.

Jovan Vavic moves for a new trial because of "newly discovered" evidence, namely, that at his codefendant Donna Heinel's sentencing hearing, which was held after his jury trial, she "admitted . . . that she acted alone with Rick Singer" and did not conspire with any coaches to wrongly admit students to the University of Southern California ("USC"). (#1566 at 4.) Vavic asserts that this information "would likely result in [his] acquittal at retrial." *Id*. For the reasons explained below, the court disagrees and recommends that the motion be denied.

I. Introduction.

In April 2022, Vavic, the former head coach of USC's water polo teams, was convicted for his role in the nationwide "Varsity Blues" college admissions scandal. The ringleader of the alleged conspiracy was Rick Singer, a corrupt college admissions consultant. Vavic was charged with participating in Singer's "side-door" scheme, in which the children of Singer's clients were admitted to elite schools as athletic recruits, regardless of how well they played the sport for which they were recruited, or whether they played the sport at all. In exchange for helping unqualified applicants get admitted, parents paid money to university accounts and also, in some instances, to

the coaches and administrators personally. The government alleged that in Vavic's case, in exchange for Vavic's help in getting unqualified applicants admitted to USC, Singer directed the parents of the students to make donations to a bank account at USC that funded Vavic's water polo teams and in addition, that Singer made private school tuition payments for Vavic's sons totaling almost $120,000.[1]

After a month-long jury trial before Judge Talwani, Vavic was convicted of all counts: conspiracy to commit honest services mail and wire fraud in violation of 18 U.S.C. § 1349, involving multiple universities (Count 2); conspiracy to commit federal programs bribery in violation of 18 U.S.C. § 371, limited to USC (Count 3); and substantive honest services wire fraud in violation of 18 U.S.C. §§ 1343 and 1346. (Count 16). (##1234, 1235.) Shortly after trial, he filed a renewed motion for judgment of acquittal under Fed. R. Crim. P. 29 and an alternative motion for a new trial under Fed. R. Crim. P. 33. (#1277.) Judge Talwani denied the renewed motion for judgment of acquittal but allowed the alternative motion for a new trial, based on the government's alleged misstatements of law and fact in rebuttal argument and reliance on Singer's false statements. (#1405); *see Vavic*, 628 F. Supp. 3d at 366-70.

While the government's appeal from the new trial order was pending, the First Circuit decided *United States v. Abdelaziz*, 68 F.4th 1 (1st Cir. 2023), another "Varsity Blues" case. In *Abdelaziz*, the First Circuit provided much-needed clarification of the murky law that applied in this case, holding that payments made to university accounts could not support a conviction for honest services fraud but could support a conviction for federal programs bribery. *Id*. at 25-26, 29-

---

[1] The facts of the case are set out in detail in District Judge Talwani's Memorandum and Order on Vavic's post-conviction motions, *see United States v. Vavic*, 628 F. Supp. 3d 330, 337-58 (D. Mass. 2022), and in the First Circuit's decision on the appeal of the case, *see United States v. Vavic*, 139 F.4th 1, 8-13 (1st Cir. 2025), and will be repeated here only as necessary for context.

33. After *Abdelaziz*, the government did not pursue an appeal of Judge Talwani's order granting a new trial on Count 2, conspiracy to commit honest services mail and wire fraud. *Vavic*, 139 F.4th at 14 n.4; *see also* #1578 at 14.

At Vavic's trial, the government sought to prove that Vavic deprived USC of its right to honest services both by accepting payments to the USC water polo account and accepting money personally, i.e., the tuition payments for his sons. *Vavic*, 139 F.4th at 18. As noted, however, according to the holding in *Abdelaziz,* payments to university accounts could not support the conviction on Count 16, for substantive honest services wire fraud. Under *Yates v. United States*, 354 U.S. 298 (1957), "[a] verdict may be set aside in cases where the verdict is supportable on one ground, but not on another, and it is impossible to tell which ground the jury selected." *Vavic*, 139 F.4th at 18 (cleaned up). The First Circuit found that there was *Yates* error on Count 16 "because it is impossible to tell if the jury reached the verdict on an invalid legal theory," that the error was not harmless, and thus affirmed the new trial order on the substantive honest services wire fraud count. *Id*. at 17-21.

The First Circuit reversed the new trial order on Count 3, and reinstated Vavic's conviction for conspiracy to commit federal programs bribery, finding that the alleged misstatements of law in the government's rebuttal argument were not contrary to the jury instructions on federal programs bribery, and that the misstatements of fact were not prejudicial. *Id*. at 21-26. The First Circuit also declined to affirm the new trial order based on the government's reliance on Singer's false statements, *see id*. at 26-29, and alleged prejudicial variance, *see id*. at 29-35.

Thus, after the First Circuit's ruling, Vavic stands convicted on Count 3, conspiracy to commit federal programs bribery, and may be tried again on Count 2, conspiracy to commit honest

services mail and wire fraud, and Count 16, substantive honest services wire fraud. Presently, he is awaiting sentencing on Count 3 before Judge Talwani.

Vavic is again seeking post-trial relief. He filed three motions for new trial, which were referred to this court for reports and recommendation. (#1577.)[2] In the motion at issue here, Vavic claims that statements made by the government and Heinel in Heinel's sentencing memoranda and at her sentencing hearing, specifically, that when participating in Singer's "side-door" scheme, she always helped to admit fake athletic recruits by herself, without the knowledge of coaches, is newly discovered evidence warranting a new trial. (#1565; #1566, memorandum). The government filed an opposition (#1579); Vavic filed a reply (#1590).

II.  The Motion for New Trial.

A.  Background.

1. The Admissions Process at USC.

Vavic was indicted and joined for trial with Heinel, who was the senior women's associate athletic director at USC and the athletic department's liaison to "Subco," the special subcommittee of the admissions department responsible for evaluating and deciding whether to admit athletic recruits. *Vavic*, 628 F. Supp. 3d at 337-41. The admissions process at USC for athletes was different than for regular applicants. *See id*. at 341. If a coach wanted to recruit a player, the coach prepared an athletic "profile" or "resume" listing the athlete's credentials and including a short paragraph about what the player would contribute to the team. *Id*. Coaches could designate a

---

[2] This court previously issued a report and recommendation recommending that another of the motions for new trial, alleging that the government suppressed material, exculpatory evidence, be denied. (#1596.) The remaining, "renewed" motion for new trial, primarily claiming retroactive misjoinder of Count 2 leading to prejudicial spillover on Count 3, (#1563), will be the subject of a separate report and recommendation.

limited number of players to receive scholarships or could designate players as "walk-ons." *Id*. As liaison, Heinel presented the credentials of athletes to Subco on behalf of the coaches. *Id*. at 341. Subco did not verify the accuracy of the materials. *Id.*

Subco did not consider an applicant's potential to donate money to the school. *Id*. at 342. Coaches were directed not to include information about an applicant's "philanthropic potential" in the materials provided to Subco. *Id.*

### 2. The Evidence at Vavic's Trial.

At trial, the government focused on Vavic's involvement with the recruitment of three of Singer's students to the water polo teams: Johnny Wilson, Vanessa Feiwell, and Agustina Huneeus.[3]

### a. Johnny Wilson.

The government alleged that Vavic, working with Singer, recruited Wilson to the water polo team by causing Wilson's falsified athletic credentials to be submitted to Subco in 2014. *Vavic*, 628 F. Supp. 3d at 347-51. Singer, who had been communicating with Wilson's father about the possibility of Wilson's "side-door" admission to USC, told Wilson's father that Vavic was "'giving [Singer] 1 boys slot[.]'" *Id.* at 347. Eventually, Singer sent information about Wilson to Vavic, who responded to Singer that he needed a "'good resume'" for Wilson in order to get him admitted. *Id.* at 348. Singer emailed Wilson's father that Vavic had his son's material and Vavic had "'asked [him] to embellish his profile more, which [he was] doing.'" *Id*. Singer eventually directed that Wilson's swim times be changed to make him look like a better player. *Id*.

---

[3] The court does not set out every fact admitted at trial concerning these three recruits; for a complete description of the evidence pertaining to each of them, *see Vavic*, 628 F. Supp. 3d at 347-58.

The next year, Vavic told Singer that he would present Wilson to Subco together with his "'top walkons'"; that same day, Vavic's wife, using her husband's personal email account, forwarded Wilson's embellished athletic information to one of Vavic's assistant water polo coaches, Casey Moon. *Id.* at 349. Moon testified at trial that he had never heard of Wilson before and that it was unusual for him to receive emails about recruitment from Vavic's wife or from a personal email account. *Id.* Subco admitted Wilson based on his falsified athletic profile, which showed that he had considerable athletic talent. *Id.*

Soon after Wilson's admission, Wilson's father sent Singer $220,000. *Id.* at 350; *see Vavic*, 139 F.4th at 11. Singer's organization later sent a $100,000 check to USC men's water polo noting the "Wilson family" as the source. *Id.*

Vavic did not reply to Wilson's email asking when the team would start practice, and his father had to ask Singer for Vavic's number so Wilson could get in touch. *Id.* Moon recalled that Wilson was at a water polo practice on the first day of practice but did not see him after that. *Id.* After his first semester, Wilson quit the team, reportedly because he had a concussion. *Id.*

b. <u>Vanessa Feiwell.</u>

Feiwell was a client of Singer's college counseling business; Singer told her that if she wanted to be the manager of a water polo team, he had connections at USC who could help her. *Vavic*, 628 F. Supp. 3d at 350-51. In September 2015, Singer told Feiwell to email her athletic profile, which he had had someone prepare and which was almost completely false, to Vavic and to say that the email was "'per our discussion,'" even though Feiwell had never communicated with Vavic before. *Id.*; *see Vavic*, 139 F.4th at 11-12. Vavic received the email, then forwarded it to Moon, and directed him to present her materials to Subco. *Id.* The materials contained Vavic's

note that she was a "'top ten goalie in the 2016 recruiting class'" and would be "'a great addition'" to the team. *Id*. Moon did not know how Vavic arrived at that conclusion. *Id.*

By 2016, Heinel and Singer had developed their own working relationship, and Singer was "going to her directly in order to admit fake athletic recruits." *Vavic,* 139 F.4th at 11. Despite Vavic's initial involvement with Feiwell, after Heinel presented her to Subco in early 2016 and she was admitted, Feiwell's father sent a $50,000 check to the Women's Athletic Board, a USC account which Heinel controlled. *Id*.

Feiwell never participated in practice or played on the water polo team. *Id.* She met Vavic once by the pool before her freshman year and he asked her if she wanted to block some shots during practice, but she said she would be uncomfortable doing that. *Id*. at 11-12. She never spoke with Vavic again. *Id*.; *see Vavic,* 628 F. Supp. 3d at 352-53.

c. Agustina Huneeus.

Huneeus was discussed in a wiretapped call between Vavic and Singer that took place on August 3, 2018. *Vavic,* 628 F. Supp. 3d at 354. When Vavic complained that he did not have any money in the water polo account, Singer told him that he had a female recruit, referring to Huneeus, and was planning to ask Heinel to help get her admitted, but he offered to "'go through [Vavic]'" so that Heinel would present her to Subco but the family's donation would go to Vavic's water polo account. *Id*. at 354-55.  Vavic said that the admissions people were "'being very, very careful now, about checking out all the resumes and crap like that,'" and suggested that he might try to "'squeeze her in'" with his top recruits so she could "'kind of get lost in the shuffle.'" *Vavic,* 139 F.4th at 12. Singer reassured Vavic that he had a "'great relationship'" with Heinel and that if Vavic presented Huneeus, Heinel would not "'push back on [Vavic].'" *Id*. Singer told Vavic that he would not tell Heinel "'about this girl'" so that Vavic could "'get funded.'" *Id.*

In spite of what he said on the call with Vavic, Singer ultimately worked with Heinel to admit Huneeus, and after Subco approved her admission as a water polo recruit, Huneeus's father paid $50,000 to the Women's Athletic Board. *Id*. Huneeus never showed up for water polo practice. *Id*.

### d. Vavic Accepts Money from Singer for His Sons' Private High School Tuition and Agrees to Help Singer in the Future.

In 2015, Vavic sent Singer an email listing the amount of tuition due to his sons' private high school and the address to which tuition checks should be sent. *Vavic*, 628 F. Supp. 3d at 353. Singer paid the tuition. *Id*. About a year later, Vavic again sent Singer another email with tuition amounts, and Singer paid it again. *Id*. at 353-54. In the recorded call on August 3, 2018, Singer told Vavic that he could get him "a lot more money" for his program if he could help Singer get recruits into schools such as Harvard and Princeton. *Id.* at 355. Vavic said that he could help because he was good friends with the water polo coaches at Harvard and Brown but that those programs had limited recruitment spots. *Id*. Vavic said he would talk to them. *Id*. He also offered to help with other schools. *Id*. Later, in a recorded call on January 2, 2019, Vavic affirmed to Singer that because of the tuition payments, Vavic would help Singer in the future. *Id.* at 357.

### 3. Heinel's Guilty Plea and Sentencing.

#### a. Background.

In its sentencing memorandum, the government alleged that Heinel was "one of the most prolific and culpable participants in Singer's athletic recruitment scheme." (#1438 at 1.) According to the government, between 2014 and 2018, "Singer's clients made payments of more than $1.3 million (between $50,000 and $100,000 per student) to USC accounts designated by Heinel, typically one dedicated to the USC Women's Athletic Board." *Vavic,* 628 F. Supp. 3d at 338.

Singer also directed payments of $20,000 per month to Heinel personally "as part of a sham consulting agreement[,]" *see id.*, payments which eventually totaled $160,000. (#1438 at 1.) In all, Heinel presented more than two dozen students to Subco as part of the scheme, many with fabricated athletic credentials, some of whom "did not [even] play the sport for which they were purportedly being recruited." *Vavic*, 628 F. Supp. 3d at 338.

Vavic and Heinel were charged together in Count 2 of the operative second superseding indictment ("Indictment"), conspiracy to commit honest services mail and wire fraud, and Count 3, conspiracy to commit federal programs bribery. (#505 at 31-33.) Vavic moved to sever his trial from Heinel's on grounds that the evidence presented against her at trial was not relevant to his case and would be unduly prejudicial. (#762 at 6-7.) He stressed that according to the allegations in the Indictment, he was charged in connection with three students, only one of whom overlapped with the "over two dozen" students Heinel was alleged to have corruptly assisted. *Id.* at 6 n.3.[4] Judge Talwani granted Vavic's motion to sever his case from Heinel's "in the interests of justice and to avoid potential prejudice." (#879.)

On November 5, 2021, Heinel pled guilty pursuant to a plea agreement, *see* #987, to Count 11 of the Indictment, which charged honest services wire fraud. (#990.)[5] As promised in the plea

---

[4] As it turns out, although Vavic was correct that the Indictment alleged that both Vavic and Heinel had a hand in the admission of only one named recruit, the Indictment did not list all the students whose admission Heinel had assisted with, *see* #505 ¶¶ 26-50, 51-75, and there was evidence presented at trial that both participated in the admission of two of the three students, Feiwell and Huneeus, *see, e.g.*, *Vavic,* 628 F. Supp. 3d at 351-56.

[5] In the plea agreement, the parties agreed to disagree about Heinel's advisory guideline range under the United States Sentencing Guidelines: they agreed that her base offense level was 7, but the government took the position that the offense level was increased by 14 because of the gain that resulted from the offense, thus resulting in an offense level of 21. (#987 at 2.) Heinel disagreed with that increase. *Id.*

agreement, the government dismissed all other counts against her following imposition of sentence, including counts which alleged that she conspired with Vavic, Singer, and others. (#987 at 1.)[6]

Vavic was tried from early March through early April 2022. (##1139, 1235.) In September 2022, Judge Talwani vacated his convictions. (#1405); *see Vavic,* 628 F. Supp. 3d at 330. The government filed an appeal in October 2022. (#1422.) While Vavic's case was on appeal, Heinel filed her sentencing memorandum, on November 22, 2022 (#1437); her sentencing was on January 6, 2023. (#1458).

b. Heinel's Guilty Plea Hearing.

Heinel's guilty plea, in November 2021, and her sentencing, in January 2023, took place before the First Circuit issued its decision in *Abdelaziz* in May 2023. At the time of Heinel's plea, the parties and the court were operating under the assumption (albeit with some pointed comments from Judge Talwani that indicated that she had serious questions about the theory) that a violation of honest services fraud could be based on Heinel's presenting false information to Subco in exchange for money that went into an account at USC that Heinel controlled and from which she derived value, for example, by benefitting professionally by controlling the funds in the account. *See* #1019 at 44-50. As noted, *Abdelaziz* made clear that payments to the school could not constitute bribes under 18 U.S.C. § 1346, honest services fraud. 68 F.4th at 27-32.

---

[6] The charges that were dismissed were Count 2, conspiracy to commit mail and wire fraud and honest services mail and wire fraud, in which Heinel was alleged to have conspired with Vavic, among others; Count 3, conspiracy to commit federal programs bribery, in which Heinel was alleged to have conspired with Vavic; Counts 10, 12, 13, 14, and 15, wire fraud and honest services wire fraud, aiding and abetting, in which Heinel was alleged to have conspired with Singer in certain phone calls and one email; and Count 18, mail fraud and honest services mail fraud, aiding and abetting, in which Heinel was alleged to have received a $20,000 payment from Singer. (#505.)

At Heinel's guilty plea hearing, the government stated the facts it would prove at trial on the single count of honest services wire fraud:

> From at least 2015 to 2019, Dr. Heinel presented student applicants to the subcommittee using athletic profiles for students that she had received from [Singer] . . .
>
> The profiles that Dr. Heinel presented misled the admissions subcommittee into believing that Heinel was presenting the applicants on behalf of USC's athletic coaches. And they contained falsified information, including in some stances[sic] information that Dr. Heinel added herself.
>
> Dr. Heinel presented those applicants to the subcommittee as athletic recruits in exchange for payments from Singer or from his clients. Dr. Heinel did not disclose to the admissions subcommittee that she was presenting the purported athletic recruits in exchange for the payments from Singer and from Singer's clients.
>
> Among the applicants Heinel presented to the subcommittee as proposed athletic recruits in exchange for such payments were a purported women's volleyball recruit and a purported women's soccer recruit, and that's in the fall of 2018.
>
> On or about October 5, 2018, Dr. Heinel, who was in California, spoke by telephone with Mr. Singer, who was in Massachusetts, and confirmed in that telephone call that she had presented the purported volleyball recruit and the purported soccer recruit to the subcommittee, that both had been approved for admission by the subcommittee. Singer, in turn, confirmed that the students' families would each pay $50,000 to USC athletic funds as directed by Dr. Heinel.
>
> Through that interstate wire communication on October 5, 2018, Heinel executed a scheme to defraud USC of its tangible right to her honest services.

(#1019 at 27-28.)

The government added that "at trial, the coaches would testify they didn't know who these students were. They had never heard of them. They didn't know who the student was. They didn't intend to have them on their teams." *Id*. at 33.

In response to direct questions from Judge Talwani, Heinel admitted that with regard to the two recruits, one for women's volleyball and one for women's soccer, she presented athletic profiles to Subco that she had received from Singer; she misled Subco into believing that the

11

profiles were from coaches; and she did so in exchange for payments from Singer or his clients to USC. *Id*. at 54-55. Heinel also admitted that she took the profiles that Singer gave her and added information herself that made the applicants look like better athletes. *Id*. at 61-63. Finally, she admitted that Subco would not have voted to accept the students had they known of the misrepresentations. *Id*. at 63-64, 67.

### c. Heinel's Sentencing.

In its sentencing memorandum, the government stressed, as stated above, that Heinel partnered with Singer for years in defrauding USC; that she was responsible for Subco's approving approximately two dozen fake recruits; and that she lied and misled Subco, coaches, and admissions officials at USC when doing so. (#1438 at 1, 3, 5.) For instance, as early as 2015, Heinel falsely presented one recruit to Subco as a football player when she knew that he had not been recruited by the football coach and there was no prospect of his joining the team. *Id*. at 2. One of the many examples the government gave of Heinel's misleading admissions officials was that Heinel falsely told one official that a prospect for the water polo team had met Vavic on an overseas trip while the prospect was playing on an international water polo team, when, in actuality, the supposed prospect did not play water polo and had never met Vavic. *Id*. at 5. The government's litany of Heinel's wrongdoing included a list of athletic recruits that she had presented to Subco without coaches' approval. *Id*. at 8.

The government further asserted, citing evidence that it would have presented at trial, that the money that Heinel received from Singer that went into Heinel's personal bank account was the proceeds of a "sham consulting agreement" between them, and disputed Heinel's claim that she received the money in return for selling her consulting business to Singer for $400,000 to be paid in monthly installments. *Id*. at 3-4, 10-11.

12

In her 55-page sentencing memorandum, Heinel argued that the USC athletic department "has long used walk-on spots to fundraise" and that some of the members of Subco, together with "higher-ranking administrators of the athletic department and the larger university advancement office accepted and embraced this underbelly as business as usual." (#1437 at 7.) Because of pressure to fundraise, she "embellished athletic profiles of prospective walk-on students who presented donor interest." *Id*. The "athletic accolades" of the recruits were provided to her by Singer and she also "added embellishments" herself. *Id*. "She did this to secure the students' admission to USC, to secure donations to the athletic department and more specifically to the Women's Athletic Board ('WAB'), and she did this to maintain her position at USC which required fundraising for the WAB." *Id*. She denied conspiring with Singer, stating that she did not know he was "sending her fraudulent athletic profiles, or that the students weren't real athletes, and there is no indication to the contrary." *Id*. at 7, 15, 21. She stated that while the athletes Singer promoted might not have been "the best[,]" she believed they were "athletes who played the sport and who the coaches at USC wanted on their teams." *Id.* at 16.

In support of her assertion that the athletic department condoned admitting students as "walk-ons" in exchange for donations, Heinel attached an exhibit consisting of many emails in which the potential for a family to donate to the university was discussed in connection with the student's admission as an athletic recruit. *See* #1437-5, "Exhibit E." Accordingly, she argued that "[e]vidence confirms that securing the admission of mediocre athletes through SUBCO as walk-on athletes in exchange for donations to the athletic department and/or the university was a recognized practice at USC." (#1437 at 15.)

Heinel also devoted long sections of her memorandum to arguing that the money she personally received from Singer was for her doing consulting work for him and selling her

consulting business to him. *See id*. at 16-19, 24-32. She admitted that, "in hindsight, [she] recognizes now that Singer probably offered to buy her business so that she would continue to present his students to SUBCO without issue[,]" arguing that he manipulated her. *Id*. at 28, 40-41.

In response to Heinel's sentencing memorandum, the government submitted that there was no evidence that USC condoned Heinel's conduct and that she mischaracterized the evidence she cited in support of her claim that what she did was an accepted practice there. (#1447 at 1-3.) The government called Heinel's claim that she believed coaches wanted Singer's applicants on their teams as "preposterous," given the strong evidence the government had that she was going behind the coaches' backs, including, at one point, when she told Singer concerning a fake water polo recruit: "'[j]ust if questioned, don't bring [Vavic] into this[,]'" suggesting she was going behind his back. *Id*. at 3. In one case, Heinel presented a Singer prospect to Subco as a lacrosse player even after the lacrosse coach told Heinel's assistant that the student was not a prospect. *Id*. Heinel decided on her own that one prospect would be presented as a beach volleyball recruit as opposed to an indoor volleyball recruit. *Id*. And in another instance, she "'t[ook] care of'" one recruit's designation as a track and field athlete – so he would not receive communications about practice times and meetings – so the coaches would not know he had been "recruited." *Id*. at 3-4.

The government cited evidence it would have presented at trial to counter Heinel's "false narrative that she did due diligence on Singer's applicants," evidence that instead established that she was trying to avoid detection when high school counselors were raising red flags about Singer's applicants. *Id*. at 4. In one of several examples, the government cited a text message Heinel sent to Singer informing him that "Huneeus needed to confirm she was being recruited because her high school counselor had told a USC admissions official that she did not believe that to be the case." *Id*.

The government also cited evidence that would show that Heinel received the $20,000 per month from Singer in return for promoting his candidates, not because she had sold him her consulting business. *Id.* at 5-7.

Heinel was sentenced in January 2023. (#1458.) At the hearing, the government recommended a sentence of 24 months in prison. (#1468 at 11.) Judge Talwani noted that Heinel did not "even admit to conspiring with anyone," which "put[] the sentencing in a very strange posture." *Id.* at 17. The government responded that the court could consider the extensive evidence against Heinel, including the fact that she took the $160,000 from Singer for her personal use, as relevant conduct, noting that even though Heinel did not plead to a conspiracy count "and now denies being involved in any conspiracy," the "quid pro quo arrangement with Singer" to which she had pled guilty established that she was "in an arrangement" with him. *Id.* at 17-18. Judge Talwani asked the government how Heinel's agreement to forfeit $160,000 as part of the plea agreement "track[ed] with" Heinel's argument that she denied that the money was a bribe. *Id.* at 18. The government responded that Heinel "ha[d] agreed not to contest that amount, not to contest that it's proceeds, while still reserving her arguments that that amount of money was not gained to her in connection with the scheme. I don't know – that's where we came out in negotiating the plea." *Id.*

Judge Talwani, for good reason, questioned the parties at length about the odd arrangement that the government had worked out with Heinel, where she pled guilty only to deceiving Subco in order to admit recruits in exchange for money that went to accounts at USC, agreed that she would forfeit $160,000 to the government, and yet maintained that what she did was an accepted practice at USC, that she had conspired with no one, and that the money that went "into her pocket" was "proceeds," as the government stated, but was not a bribe. *Id.* at 17, 24-28, 50.

15

Judge Talwani pressed Heinel's counsel on whether the coaches were "in the loop" when Heinel was recommending recruits to Subco and counsel agreed they were not. *Id*. at 36. The government chimed in that Heinel was presenting applicants "with no knowledge on the part of the coach. We have coaches saying they hadn't even heard of these people." *Id*. at 38-39. Judge Talwani eventually summed up what Heinel had admitted to: "[Heinel] was using a system that was designed to have a coach weigh in, and she was doing that without the coach weighing in and then providing her own potentially fake information about the person." *Id*. at 40. She continued: "the impression of this large conspiracy was how much the coaches were involved in doing all of this, and yet it comes out that much of this [Heinel was] doing behind the coaches' backs as well. So that's the offense that's in front of me." *Id*. at 60. She concluded that the offense of conviction "involved [Heinel] agreeing to put people forward without the coaches involved, without regard to the truthfulness of their candidacy and … the related conduct of the … stream of money that went with it, including the $160,000." *Id*. at 59. She sentenced Heinel to six months' imprisonment. *Id*. at 63.

### 4. The Parties' Positions on the Motion for New Trial.

Vavic moves for a new trial because Heinel "admitted at her sentencing hearing that she acted alone with Rick Singer to improperly facilitate student admissions, as did the government in its sentencing memoranda and statements at the hearing." (#1565 at 1.)[7] He asserts that until Heinel and the government revealed this at her sentencing, this information was not available to him, even though he diligently sought it. *Id*. According to Vavic, Heinel's admissions "amount to post-

---

[7] In fact, as stated above, Heinel denied conspiring with anyone, including Singer, *see, e.g.*, #1437 at 7 ("[Heinel] did not conspire with Rick Singer to put through fake athletes[.]"). The credibility of Heinel's assertion that she acted by herself in helping admit fake recruits, and did not conspire with anyone, is addressed below.

16

conviction statements by an alleged co-conspirator" and "the government's admissions in its sentencing memoranda and at Heinel's hearing are admissions by a 'party-opponent.'" (#1566 at 8.) The evidence is "highly material to the only remaining count (Count 3)" and "would likely result in Vavic's acquittal at retrial." (#1565 at 1.) Finally, Vavic claims that the court has good cause to extend the three-year deadline of Federal Rule of Criminal Procedure 33 for filing a motion for new trial. *Id.*

The government argues that Heinel cannot clear the first step required for a new trial motion, namely, to show that the evidence was "unknown or unavailable" to him at the time of trial, because of the avalanche of discovery provided pretrial and evidence presented at trial that Heinel often went behind coaches' backs in presenting unqualified candidates to Subco. (#1579 at 8-10.) In fact, as the government points out, there was substantial discovery provided to Vavic "showing that Heinel went behind [*Vavic's*] back in submitting a Singer client as a fake water polo recruit" to Subco. *Id.* at 10 (emphasis in original). The government cites numerous examples of Vavic's use of the evidence that Heinel acted without coaches' knowledge in pushing candidates through Subco in pretrial filings and at trial, including arguing to the jury that it was Heinel, not Vavic, who put Feiwell and Huneeus through Subco. *Id.* at 13-14. The jury rejected this argument; the evidence at trial, the government argues, conclusively proved that Heinel and Vavic conspired together. *Id.* at 2. Finally, the government asserts that the claim is time-barred. *Id.*

Vavic responds that he "has never contended that he did not know during his trial that Heinel acted behind USC coaches' backs[,]" conceding that "that fact was one of [his] core defenses before, during, and after trial." (#1590 at 7.) The "newly discovered" evidence, according to Vavic, is that at her sentencing hearing, and not before, "*Heinel herself admitted* what Vavic had tried to argue all along: that Heinel 'was making the decisions instead of the coach' and that

'coaches weren't in the loop.'" *Id*. at 8 (emphasis in original). Thus, Vavic's argument boils down to this: that he is entitled to have a new trial so that he can call Heinel as a witness to deny that she conspired with him, that is, to say that she always went behind his back when presenting water polo recruits.

III. The Law.

A court may grant a new trial "if the interest of justice so requires." Fed. R. Crim P. 33(a). "Any motion for a new trial grounded on newly discovered evidence must be filed within 3 years after the verdict or finding of guilty." Fed. R. Crim. P. 33(b)(1). A defendant seeking a new trial based on newly-discovered evidence must show the following: (1) the evidence was unknown or unavailable to him at the time of trial; (2) the defendant's failure to discover the evidence was not due to a lack of diligence; (3) the evidence is material, and not merely cumulative or impeaching; and (4) the evidence would probably result in the defendant's acquittal on retrial. *See United States v. Laureano-Salgado*, 933 F.3d 20, 28 (1st Cir. 2019); *United States v. Maldonado-Rivera*, 489 F.3d 60, 65-66 (1st Cir. 2007). "A new trial motion must be denied if the defendant fails to meet any one of these factors." *United States v. Gorbea Del-Valle*, 566 F.3d 31, 38 (1st Cir. 2009) (additional citation omitted). Meeting these factors poses a "hefty burden" for a defendant seeking a new trial. *Laureano-Salgado*, 933 F.3d at 28. "'The remedy of a new trial must be used sparingly, and only where a miscarriage of justice would otherwise result.'" *Gorbea Del-Valle*, 566 F.3d at 38 (quoting *United States v. Conley*, 249 F.3d 38, 45 (1st Cir. 2001)).

IV. Discussion.

The court will address the fourth element in the motion for new trial test first, that is, whether the evidence in question "would probably produce an acquittal at a retrial[.]" *Laureano-Salgado*, 933 F.3d at 28. "The actual-probability-of-acquittal standard requires 'an evaluation of

18

the new evidence in juxtaposition to the evidence actually admitted at trial.'" *Id*. at 31 (quoting *United States v. Josleyn*, 206 F.3d 144, 157 (1st Cir. 2000)).

As an initial matter, the court addresses the credibility of Heinel's statement that she did not conspire with anyone, including Singer. At her guilty plea, she clearly admitted (1) that she presented athletic profiles to Subco that she had received from Singer, profiles that she had embellished herself; (2) that she misled Subco into believing that the profiles were from coaches and did so in exchange for payments from Singer or his clients to USC; and (3) that Subco would not have admitted the students had they known what she was doing. *See* #1019 at 54-58, 61-64, 67. In other words, she admitted to conspiring with Singer to commit federal programs bribery, *see Abdelaziz*, 68 F.4th at 21-27.

Further, in evaluating the statements on which Vavic rests his argument, such as Heinel's statement in her allocution that she "'put words on'" resumes that "'coach[es] did not say[,]'" and Heinel's counsel's statement at sentencing that "'Heinel was making the decisions instead of the coach'" and that "'coaches weren't in the loop,'" *see* #1566 at 5 (first alteration in original), one must consider the context of Heinel's plea and sentencing. Heinel pled guilty to one count of honest services fraud concerning two recruits whose coaches, in fact, did not know that Heinel was presenting them. Then, because the government agreed to dismiss all other charges against her, she was permitted, in the face of very strong, if not overwhelming, contrary evidence, to argue that she was not guilty of anything else, including conspiring with anyone else, pocketing money from Singer, and knowing that the resumes Singer provided her were falsified.[8]

---

[8] For the same reasons, Vavic's argument that the government's statements made in connection with Heinel's sentencing, that Heinel never conspired with any coaches, mean that the government takes the position that Heinel is not guilty of conspiring with Vavic borders on the absurd. It is clear that the government's position is that Heinel did, in fact, conspire with Singer and Vavic.

19

An even bigger problem for Vavic is that given the facts of his case and the law regarding conspiracy that applies to Count 3, it was not necessary that Heinel have direct contact with him. Count 3 is a USC-only conspiracy charging Heinel and Vavic, together with "others known and unknown to the Grand Jury," including Singer, with conspiring to commit federal programs bribery. (#505 ¶ 156); *see Vavic,* 139 F.4th at 31. On appeal to the First Circuit after his trial, Vavic argued that there was a prejudicial variance between the evidence at trial concerning the alleged conspiracy in Count 3 and what was alleged in the Indictment. *Vavic,* 139 F.4th at 30-32. In discussing this issue, the First Circuit characterized the charged conspiracy as a "classic hub-and-spoke conspirac[y], with Singer as the hub at [its] center." *Id*. at 31. The First Circuit addressed three factors to determine whether Vavic knew about and agreed to join the conspiracy: (1) the existence of a common goal; (2) interdependence among the alleged participants in the charged conspiracy; and (3) overlap among the alleged participants in the charged conspiracy. *Id*. (citing *Abdelaziz,* 68 F.4th at 42).

The First Circuit found that it did not matter if Vavic only dealt with Singer and not Heinel in connection with the conduct charged, "so long as he knew that 'the other spokes [were] spokes.'" *Id*. at 32 (quoting *United States v. Falcon-Nieves*, 79 F.4th 116, 134 (1st Cir. 2023)) (alteration in original) (and citing, and summarizing, *United States v. Cruz-Rodriguez*, 541 F.3d 19, 28 (1st Cir. 2008) for the proposition that "knowledge in a conspiracy may be proven without showing that 'each conspirator knew of or had contact with all other members' or that 'each conspirator knew of all the details of the conspiracy'"). The First Circuit found that the evidence demonstrated that Vavic knew Heinel was a "spoke": "a rational jury could have inferred such knowledge from the fact that it was Heinel, not Vavic, who ultimately facilitated [Feiwell's] and [Huneeus'] fake

recruitments." *Vavic,* 139 F.4th at 32. Further, Singer told Vavic in a call that he had an independent relationship with Heinel. *Id*.

With regard to whether Vavic shared a "common goal" with Heinel, "[a] rational jury could have found that Vavic reviewed [Feiwell's] credentials and directed Moon to create her Subco materials, at which point Heinel presented her application to Subco." *Id.* "Similarly, a reasonable jury could have concluded that Singer, Vavic, and Heinel all worked toward a common goal of admitting the same applicant, and they all stood to benefit financially in maintaining the viability and secrecy of Singer's side-door scheme." *Id*. at 32-33.

Finally, the First Circuit found that the interdependence prong was satisfied by the fact that Vavic needed Heinel to present his recruits to Subco, "so he would have needed to work through her to present any of Singer's clients." *Id*. at 33. In the August 3, 2018 call between Vavic and Singer, Singer reassured Vavic that Heinel would not "push back on" him for Huneeus' fake recruitment, signaling that Heinel "exercised some level of consent for each recruit once her relationship with Singer was well underway." *Id.*  Finally, the First Circuit found that even though Heinel and Vavic were in competition for fake recruits to donate money to accounts they controlled, Vavic still needed Heinel's cooperation to push recruits through Subco, and Heinel had an interest in cooperating with Vavic to perpetuate the scheme, so that "Vavic and Heinel depended on one another, despite some competition." *Id*.

As the First Circuit's explication of how the law pertaining to conspiracy applied to the evidence at Vavic's trial illustrates, the "newly discovered evidence" here would make no difference at Vavic's retrial. The government did not allege that Heinel had anything to do with Wilson's recruitment, and the government had strong evidence that Vavic conspired with Singer concerning the initial recruitment of Feiwell and Huneeus, even though Heinel eventually

presented both recruits to Subco. Heinel certainly could not credibly testify that she did not present Feiwell and Huneeus to Subco, or that their parents did not donate to USC afterward. She could say, in insisting that she did not conspire with anyone, that she did not know anything about Vavic's involvement in the scheme, that she thought that Vavic's false resumes pertaining to Feiwell and Huneeus were true, and that she was not conspiring with Singer, but given the weight of the evidence, that testimony would not be credible. Further, as set out by the First Circuit, the evidence that Vavic knew that Heinel was involved with Singer was overwhelming, including from recorded calls in which Singer explicitly told Vavic that he was working with her. And how else would Vavic explain his own complacent reactions to having water polo recruits admitted, such as Feiwell and Huneeus, who, it was obvious, did not play water polo?

Yet another problem with Vavic's plan to call Heinel at trial is what she would say if called. Vavic did not include an affidavit from her or any information about what she would testify to in connection with this motion, other than her statement that she did not conspire with anyone. However, Vavic submitted an affidavit in connection with another motion for new trial, concerning alleged exculpatory evidence that the government failed to provide Vavic after the government engaged in an attorney proffer with Heinel's counsel. In that affidavit, Heinel's counsel proffered that Heinel would testify that she knew that "[other] coaches and Vavic used Rick Singer to bring walk-ons onto the team whose parents were wealthy in order to receive donations onto their gift accounts." (#1568-1 ¶ 3.) Her counsel also relayed to the government that there were "inaccuracies" in certain applicants' materials presented to Subco and that "the water polo team had the majority" of these problems. *Id.* ¶ 5. Further, "a particular student's resume appear[ed] to be falsified based on what was written in the resume when compared to what was reported on the USC water polo website." *Id.* ¶ 7. Another statement from Heinel's counsel: "Vavic may have lied

about a female water polo player whom Heinel presented in [S]ubco. The biography stated her proficiency in the sport, but her essay in her application stated that she had a [redacted] and could no longer play water polo." *Id.* ¶ 8. And finally: "[e]ach resume that Casey Moon falsified appeared to be similar based on the amount and types of accolades and awards listed." *Id.* ¶ 9.

What Vavic proposes is this: he will call Heinel to say that she was always acting behind his back. But the government already provided voluminous evidence that she did so, as mentioned above. Her testimony would not make any difference with regard to the evidence pertaining to Wilson, in whose admission she played no role (other than putting him through Subco). At trial, there was no evidence that she communicated with Vavic with regard to Feiwell and Huneeus. Vavic spoke to Singer on recorded calls about their falsified applications and caused those applications to be submitted to Subco, after which Heinel presented them. Consequently, her testimony that she did not conspire with him on those two would make no material difference at trial. Her testimony would have no effect on the evidence pertaining to Vavic's accepting tuition payments for his sons from Singer, because she was not involved with that, either. Further, she would presumably testify, as stated in the affidavit memorializing her attorney proffer, that she knew Vavic presented applicants to Subco so that Singer would donate money to the water polo account and that he falsified students' materials.

V. Conclusion.

In short, the proffered "newly discovered" evidence does not come close to establishing an "*actual probability* that an acquittal would have resulted if the evidence had been available." *Josleyn*, 206 F.3d at 151 (emphasis in original). Since the failure to meet any one of the four elements of the test for whether a new trial should be granted is fatal, *see Gorbea Del-Valle*, 566

23

F.3d at 38, the court need not address the other elements. The court recommends that the motion be denied.

Any party that objects to this Report and Recommendation must, pursuant to Fed. R. Crim. P. 59(b), file specific written objections with the Clerk of this Court within fourteen (14) days of service of this Report and Recommendation. The objections must specifically identify the portion of this Report and Recommendation to which objections are made and state the basis for such objections. Failure to comply with Fed. R. Crim. P. 59(b) will preclude further appellate review. *See United States v. Valencia-Copete*, 792 F.2d 4, 6 (1st Cir. 1986).

May 5, 2026

/s/ M. Page Kelley
M. Page Kelley
United States Magistrate Judge